GREAT ATLANTIC & PACIFIC TEA CO. v. CREAM OF WHEAT CO.

(District Court, S. D. New York. July 20, 1915.)

No. 12–224.

1. MONOPOLIES &#9758;17—"RESTRAINT OF TRADE"—INJUNCTION.

The refusal of the manufacturer of an unpatented food product, which is not a necessity of life or even a staple article of trade, who has a monopoly only because of the trade-name under which it is sold, it being open to any one else to make and sell the same article under any other name which does not infringe such trade-name, to sell to a dealer who resells at retail at less than the regular price charged by other retailers, and a price which gives to the retailer no profit, while to an extent it lessens competition, is not an unreasonable "restraint of trade," nor is it unlawful under the Clayton Act (Act Oct. 15, 1914, c. 323, § 2, 38 Stat. 730) as a price discrimination, the effect of which "may be to substantially lessen competition or tend to create a monopoly, "so as to entitle the would-be purchaser to relief by injunction under section 16 of the act; but, on the contrary, the effect of such an injunction would be to restrain trade by making it impossible for competitors to handle the article, except at a loss, and to give such purchaser a monopoly.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. &#9758;17.

For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

2. MONOPOLIES ⬅17—INTERSTATE COMMERCE LAW—CONSTRUCTION OF CLAYTON ACT.

Construing together the provisions of section 2 of the Clayton Act the last proviso in effect authorizes persons engaged in selling goods in interstate commerce to select their own bona fide customers, provided the effect of such selection is not to substantially and unreasonably restrain trade; and the refusal of a manufacturer to sell its product to a dealer, who avowedly uses it in a manner which injures and lessens the trade of the maker, cannot be said to be an unreasonable restraint of trade, nor a violation of the statute.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ⬅17.]

3. MONOPOLIES ⬅24—INTERSTATE COMMERCE—STATUTORY REGULATION.

Congress is without constitutional power to authorize the courts by injunction to compel a person, selling goods in interstate commerce, and affected by no public duty, to sell his goods to a particular customer.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⬅24.]

4. MONOPOLIES ⬅17—INTERFERENCE WITH COMMERCE—INJUNCTION.

The sending out by a manufacturer of circulars to wholesale dealers, who are its customers, requesting them not to sell its product to a particular dealer, on the ground that he is cutting retail prices, is within its legal rights, and cannot be enjoined.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ⬅17.]

5. WORDS AND PHRASES—"MANUFACTURING."

"Manufacturing" is a word of such wide and loose meaning as to include the preparation by art of any finished product from raw material.

6. WORDS AND PHRASES—"MIDDLINGS."

"Middlings" are the coarse flour and fine bran separated by bolting from fine flour and coarse bran.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Middlings.]

In Equity. Suit by the Great Atlantic & Pacific Tea Company against the Cream of Wheat Company. On motion for preliminary injunction. Denied.

Martin Conboy, of New York City, for the motion.

Jos. J. Baker, of New York City, and Rome G. Brown, of Minneapolis, Minn., opposed.

HOUGH, District Judge. Although the application is for relief pendente lite only, all the essential facts are set forth with clearness and without contradiction upon any material point. The novelty of the litigation is such that a careful statement of what these facts are is more than excusable, for upon them will depend conclusions of law toward whose final settlement the action of this court is but a preliminary.

Plaintiff is a corporation of New Jersey, defendant of North Dakota, and has appeared herein protesting against the jurisdiction. This point has been resolved against defendant in other proceedings and by another judge. Following that decision, and without expressing any opinion thereupon, it is held, for the sake of the record, that jurisdic-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion exists, and that defendant was lawfully obliged to respond to process.

[5] The business of defendant is what is commonly called the "manufacture" and sale of the food product known as "Cream of Wheat." "Manufacturing" is a word of such wide and loose meaning as to include the preparation by art of any finished product from raw material; but more accurately descriptive words for defendant's business are selection and cleansing of the by-product of a true manufacture, viz., flour making.

[6] "Middlings" are the coarse flour and fine bran separated by bolting from fine flour and coarse bran. These middlings defendant "selects," selection depending upon the grade and kind of wheat used by the miller, and then purifies or cleanses such selection. The result is Cream of Wheat, which is no more than purified middlings. It is not patented, any one can make it who can get middlings, and the amount of that material annually required by the business of defendant is less than 1 per cent. of the amount thereof produced in the same period by the millers of the United States.

Obviously defendant does not and cannot control, nor indeed does it seek to control or monopolize, the production of, or market for, middlings. It naturally wishes to buy its raw material wherever it can procure the same easiest, best, and cheapest. Yet it has a monopoly—a perfectly lawful monopoly—in the trade-name "Cream of Wheat." By the law of trade-mark and unfair competition, no one but defendant can sell, under the name chosen by defendant, what any one can make and sell under another and noninfringing label. The style and dress, name, and package of defendant have been extensively and successfully advertised for 18 years, until the public has grown accustomed to ask for and get something good to eat under the name "Cream of Wheat"; and an identical substance under another name would have to travel the same long, hazardous, and expensive path in order to get or create a market.

It is possible to assert that the (say) 1 per cent. of middlings, which, when selected and purified, is called Cream of Wheat, is for legal purposes, at all events, a different commodity, a separate thing or entity, from all other middlings. The point is mere dialectic, for all that makes the difference or separates the things is a name, and the substantial truth remains that defendant's business consists in lawfully monopolizing a trade-name, and impressing the public with the purity, reliability, and uniformity of the very common substance it sells under that cleverly chosen name. The selection of the name was quite as important as the selection of the middlings, when business began, and, after so much advertising, the name or brand is by long odds the most important element in the business.

Plaintiff is the founder and proprietor of an unusually large number of stores widely scattered through the Middle and some of the Eastern states. If not grocery stores in the common acceptance of that phrase, they sell many, if not most, "groceries." Out of more than 1,000 establishments owned by plaintiff, a large proportion are known as "Economy Stores," which are places having but a single attendant and

no telephone, giving no credit, making no deliveries, and closed whenever the manager leaves for meals or sleep. The maintenance charge, or overhead expense, of such stores is plainly smaller than that of groceries managed in the usual way; and at them plaintiff seeks to compensate for lack of conveniences by cheapness of price. Such a storekeeper as plaintiff obviously has under his own hand as many outlets or places for reaching the consumer as some jobbers or wholesalers have customers. He can buy for his own convenience, and in order to sell over his own counters, in quantities as large as does many a jobber who would refuse retail trade. In short, the plaintiff is in buying a wholesaler (on perhaps no great scale), and in selling is a very large retailer.

For purposes of this discussion, relations between plaintiff and defendant begin in 1913. In January of that year defendant published a new scheme of sales, revoking all existing plans, methods, or agreements. The action was timely, if not caused by legal advice based on the price regulation cases, of which the dissent in Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, was the premonitory rumble, and Victor Talking Machine Co. v. Straus (D. C.) 222 Fed. 524, is the last echo.[1]

By the printed scheme just mentioned the Cream of Wheat Company held itself out as refusing to sell to "consumers, retailers, or chain or department stores." It reserved the right to refuse to sell to anybody who failed to comply with any request made, and deemed by defendant beneficial to itself, the "trade at large," or the "interests of the consumer," and announced as its policy that it would "confine our sales exclusively to wholesalers." Sales, however, once made, were absolute, and the transaction closed. Sale was to imply no agreement to maintain or fix any price on a resale; nevertheless defendant *requested* that retail prices be kept at the level recommended by it.

This request, taken in conjunction with the reserved right to cease selling to any one who did not comply with requests from the same source, was in effect saying plainly enough: Keep up the retail price, or we will stop supplying you, if we think such stoppage profitable. I do not suppose that this sales scheme was a contract, or anything enforceable against defendant; but it serves to show a professed state of mind.

Notwithstanding, however, this published sales plan, defendant, well knowing that plaintiff sold directly to the consumer, sold Cream of Wheat to plaintiff at wholesale rates and in large quantities, upon condition that, in making sales over the counter, no smaller price should be charged than the small retailer had to ask in order to get a fair profit, viz., not less than 14 cents the package.[2] In or about January, 1915,

[1] These cases resting on sales of patented articles are cited, merely to emphasize my opinion that restrictions in use and limitations on sale are essentially the same thing, if title passes to the *thing* limited or restricted. The dissent in the Henry Case loudly prophesied to the profession what has since become history.

[2] The effect of defendant's price list was and is this: The Cream of Wheat Company sold to wholesalers at $4.10 per case of 36 packages, and in car load lots at $3.95 per case. The wholesaler was "requested" to sell to the retailer

plaintiff refused to observe this agreement or request, and openly sold Cream of Wheat at its "Economy Stores" for 12 cents per package.

It is fairly inferable from this history that the published sale plan of 1913 was incomplete or inaccurate. It should have added:

"We reserve the right to sell at wholesale rates and in car load lots to *anybody* who will not cut the consumer's price below 14 cents."

Defendant's selection, acceptance, or rejection of a customer did not depend upon the wholesale or retail character of his business, but largely, if not wholly, upon whether he could be depended on to maintain "requested" rates. After some talk and writing, plaintiff remained contumacious, and refused to maintain prices, whereupon defendant refused and still refuses to sell Cream of Wheat to plaintiff at any price or in any quantity whatever. The defendant also sent out circulars to the jobbing trade pointing out the "cut rate" practices of plaintiff, and asking the recipients to see to it "that no quantity [of Cream of Wheat] at any price shall reach directly or indirectly the [plaintiffs] to enable them to continue their present menace to the legitimate trade."

In result, the situation when suit was brought was that plaintiff could not make any money on Cream of Wheat sold at 12 cents, because it could not get car load rates; but no great success attended defendant's efforts to prevent jobbers selling to plaintiff. There were and are too many men quite willing to let the Atlantic & Pacific Company lose some money, as long as they made a little. This condition of affairs still continues, and the main object of this action and of the present application is to compel defendant to fill plaintiff's orders for Cream of Wheat in car load lots at $3.95 per case. Of course the bill does not put the matter so baldly,[3] but if the law does not warrant an order productive of the result stated this action is of little worth.

It is not worth while to consider whether the facts above shown produce a case under the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209). If they do, the matter is not much advanced, because under that statute the plaintiff could not bring this action in equity; and, if

at $4.50 per case, a figure which enables the ordinary groceryman to get a moderate profit on selling at 14 cents the package. At 12 cents per package, loss is almost certain, unless the goods are obtained at $3.95 the case.

[3] The prayers of the bill are as follows:

"1. That it be adjudged that the said plan or system of sales and said system of embargo are illegal, and that the defendant herein has violated sections 1 and 2 of the act of Congress of July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies' [Comp. St. 1913, §§ 8820, 8821], and section 2 of the act of Congress of October 15, 1914, entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes.'

"2. That defendant be enjoined and prohibited from enforcing and carrying out *said plan or system of sales,* or from enforcing or attempting to enforce said embargo by means of said boycotting, blacklisting, or otherwise, *and from thereby* in any manner or to any extent *cutting off the plaintiff's supply of said article 'Cream of Wheat'* within the jurisdiction of the United States until such time as your honors shall appoint and direct and order herein, and that upon such hearing the writ herein prayed for be made and confirmed until the final determination of this suit, and that thereupon said injunction may be made perpetual."

they do not, plaintiff just as firmly asserts its right to relief under the Clayton Act (Act Oct. 15, 1914, c. 323, 38 Stat. 730). I shall therefore follow counsel (none of whom has discussed the applicability of the Sherman Act) and say no more about it.

[1] It is urged that defendant's professed and published scheme of sales, plus its practice thereunder, create an actual monopoly of, and do lessen competition in, Cream of Wheat; that this result is in itself unlawful, and is produced by means which are specifically prohibited by section 2 of the Clayton Act, viz., price discriminations not justified by any of the exceptions of that section. As the next and final step in justification of its procedure, plaintiff asserts itself to be threatened with loss or damage through the above-stated violations of section 2, and therefore seeks an injunction under section 16. The text of these sections is given in a footnote,[4] and I shall hereafter assume (but not find) that, if defendant has violated section 2, plaintiff has good right to use section 16.

It will show my interpretation of section 2, and emphasize any errors of construction, to pick out, sometimes paraphrase, and arrange in order the words of that section deemed applicable to the case in hand, thus: It is unlawful for a person engaged in commerce,[5] and in the course of commerce, to discriminate in price between purchasers of

---

[4] Section 2. "It shall be *unlawful for any person engaged in commerce, in the course of such commerce*, either directly or indirectly to *discriminate* in price *between different purchasers of commodities*, which commodities are sold for use, consumption, or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, *where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce:* Provided, that *nothing* herein contained *shall prevent discrimination* in price between purchasers of commodities on account of differences *in* the grade, quality or *quantity* of the commodity sold, or that makes only due allowance for difference in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And provided further, that *nothing* herein contained *shall prevent persons engaged in selling goods*, wares, or merchandise in commerce from *selecting their own customers in bona fide transactions and not in restraint of trade.*"

Section 16. "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the anti-trust laws, including sections two, three, seven and eight of this act, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: Provided, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission."

[5] Commerce can only mean (as the context shows) interstate or foreign commerce.

commodities,[6] whenever discrimination may substantially lessen competition, or tend to create a monopoly in any line of commerce;[7] but there may be price discrimination on account of quantity of commodity sold, and persons selling goods may still select their own customers in bona fide transactions,[8] and not in restraint of trade.

Plaintiff's syllogisms in support of the demand for relief are simple, thus: (1) Defendant has a monopoly in Cream of Wheat; (2) through such monopoly it fixes the resale price of that article: Therefore (3) it prevents competition in Cream of Wheat and violates the body of section 2. Again: (1) Preventing competition is restraint of trade; (2) defendant does prevent competition: Therefore (3) it restrains trade and is not within the exception of section 2. If the premises of the above logical formulæ are admitted in the sense and to the extent plaintiff asserts or assumes as proper, the conclusions flow as matter of course. A successful answer must deny or avoid the premises, or ascribe to words a scope and meaning at variance with plaintiff's usage.

Taking up seriatim the parts of the above propositions: It is true that defendant has a monopoly in Cream of Wheat; but, as heretofore stated, it is a lawful monopoly, ultimately resting on the plain truth that there can be nothing anywhere in the United States lawfully called Cream of Wheat without defendant's consent and approbation. In that substance (if legally it is a distinct substance) defendant has the monopoly of a creator, something which is not and never has been within the prohibition of any law, anti-trust or otherwise. On the contrary, that monopoly is encouraged by patent, trade-mark, and copyright statutes, and the rules of unfair competition. Therefore the implication of plaintiff's premise, that there is something inherently wrong in defendant's monopoly, is false and misleading.

The minor premise, that defendant *fixes* the resale price, is not, in my opinion, true in point of fact. It would like to fix that price, so far as its minimum is concerned; but *fixing* connotes enforcement. That it cannot accomplish, and since 1913 at all events the attempt has been abandoned. Let it be assumed that defendant declines business with all who refuse to maintain prices. If such refusal affected a necessity of life, or even a staple article of trade, the matter might be serious, and history might be appealed to for instances of statutory punishment —e. g., the engrossing acts. But mere abstention from dealing cannot per se be price fixing, because the price is not made to depend upon any contract or agreement even thought by the parties to be enforceable. To call defendant's acts price fixing is inaccurate, and evades obvious legal questions, viz., whether defendant has the right to decline business, and whether it is anybody's business why the business is declined.

---

6 That is, "commodities" sold by the "person" first named.

7 "Line of commerce." This vulgarism is not a term of art, but it must mean trading or dealing in the commodities (or some of them) first above spoken of.

8 It would have been simpler to say that vendors may select their own bona fide customers. I think the intent is to exclude from the exception pretended sales, e. g., consignments to undisclosed agents, and perhaps sales coupled with an attempted condition subsequent.

Therefore, because I cannot accept the meaning imputed to the words used by plaintiff, it is not found necessary to reach the conclusion of the first proposition.

Concerning the second syllogism: It must be admitted that there is abundant authority for the general proposition that preventing competition is restraint of trade; but it does not follow that it is unlawful either to prevent any and every species of competition or to restrain trade in any and every degree. The only competition prevented or sought to be prevented by defendant's acts is that of Cream of Wheat against itself; the only trade restrained is the commercial warfare of a large buyer against small ones, or that of a merchant who for advertising purposes may sell an article at a loss, in order to get customers at his shop, and then persuade them to buy other things at a compensating profit. That competition, as encouraged by statutes and decisions, does not include such practices, has been sufficiently shown (with ample citations) in Fisher Flouring Mills Co. v. Swanson, 76 Wash. 649, 137 Pac. 144, 51 L. R. A. (N. S.) 522.

It is further obvious that, when plaintiff premises that preventing competition is restraining trade, it is assumed that the resultant restraint is *unreasonable;* for there is nothing in the Clayton Act to compel or induce courts to hold that the trade restraint referred to by this statute differs in kind, quality, or degree from that now held to be meant by the Sherman Act.

Because, therefore, I am not persuaded that the acts of defendant have produced, or tend to produce, diminution of any competition favored by reason or law, or have restrained trade unreasonably (if at all) I do not find it necessary to accede to the second syllogism.

Mere doubt of the propositions of plaintiff would require refusal of preliminary injunction; but I may more distinctly state my reasons for thinking that even definite, positive, and admitted price regulation is not unreasonable restraint of trade in the present instance.[9]

Cream of Wheat is not a necessity; it is not even a staple article of commerce. If it be a commodity at all, the commodity and the name are synonymous. Its continued existence depends upon defendant's ability to control the marketing of its own product. The doing of what plaintiff wishes would take from every groceryman near an "Economy Store" the last incentive to buy any Cream of Wheat, and collectively such grocery keepers are more important to the public and the defendant than is the plaintiff. If injunction were granted,

---

[9] There is surely a very obvious difference between enforcing by legal process an agreement to regulate prices and regulating prices by legal process. The agreement may be, and usually is, unenforceable. Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150, gives the reasons. But it is not necessarily unlawful for a man to do voluntarily what he cannot be compelled to do. It follows, therefore, that even under the Clayton Act price regulation accomplished without undue or unreasonable trade restraint, and by a judicious selection of customers, may be lawful. It *seems* to be argued for plaintiff that, because defendant could not enforce a price agreement, it cannot by any method accomplish, even partially, the same result. It is an amusing commentary on this doctrine that the main object of this suit is to have this court *compel* delivery of Cream of Wheat at $3.95 per case, which is pro tanto price fixing.

·defendant and many retailers would be injured, and the microscopic benefit to a small portion of the public would last only until plaintiff. was relieved from the competition of the 14 cent grocers, when it, too, would charge what the business would normally and naturally bear. In short, it is plaintiff, and not defendant, that pursues methods whose hardship and injustice have often been judicially commented upon. U. S. v. Freight Assocn., 166 U. S. 321, 17 Sup. Ct. 540, 41 L. Ed. 1007.

In my judgment the prevention or limitation of practices such as plaintiff's (so far as consistent with statute law) is the reverse of unreasonable.

There remain two legal inquiries (previously suggested) to which this motion justifies answers, which answers go to the root of plaintiff's case. The questions are: (1) Does section 2 of the Clayton Act apply to the defendant at all? and (2) Is it within the power of Congress to ·compel defendant to do what plaintiff demands?

[2] Section 2 plainly identifies the lessening of competition with restrain of trade. (Cf. the body of the section with the last exception.) But price discrimination is only forbidden when it "substantially" less-·ens competition. Construing the whole section together, the last exception reads in effect that a "vendor may select his own bona fide customers providing the effect of such selection is not to *substantially* and *unreasonably* restrain trade." How it can be called substantial and unreasonable restraint of trade to refuse to deal with a man who avowedly is to use his dealing to injure the vendor, when said vendor makes and sells only such an advertisement begotten article as Cream of Wheat, whose fancy name needs the nursing of carefully handled sales to maintain an output of trifling moment in the food market, is beyond my comprehension.

[3] Turning to the second question: If it be granted that section 2 does apply, and that defendant's selection of customers results in unlawful restraint of trade, can it be possible that such person's evil ways are to be amended, not by stopping his business, but by adding to his list of customers one or many persons chosen by Congress? Numerous individuals and corporations have been enjoined from restraining the trade of other people, no matter how flourishing the offenders' trade might be, nor how greatly the general volume of trade had increased during the period of restraint. But never before has it been urged that, if J. S. made enough of anything to supply both Doe .and Roe, and sold it all to Doe, refusing even to bargain with Roe, ·for any reason or no reason, such conduct gave Roe a cause of action.[10] If Congress has sought to give him one, the gift is invalid, because the statute takes from one person for the private use of another the first person's private property.

10 The following decisions recognize the inherent right of refusing business, but bear no relation to the facts herein: In re Grice (C. C.) 79 Fed. 627; Greater New York, etc., Co. v. Biograph Co., 203 Fed. 39, 121 C. C. A. 375; Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann Cas. 764; Standard Oil Co. v. United States, 221 U. S. 56, 31 Sup. Ct. 502, 55 L. ·Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734.

Using the word "sell" or "sale" conceals the issue. If a man prefers to keep what he has, an offer of money to salve the taking thereof does not prevent such taking from being confiscation. The Cream of Wheat Company is a purely private concern, except as regulated by its creating law. It is an ordinary merchant, whose business is affected by no public use whatever. The statute as construed by plaintiff descends upon that private merchant, and commands him to make a contract by which he transfers his property for a price, but against his will. The contract and the price are legally mere surplusage; the constitutional violation lies in the compulsion, whereby he is deprived of his property for a private purpose. If defendant's actual scheme of interstate business is unlawful, the United States certainly, and now perhaps an individual plaintiff, can put it out of business; but neither the nation nor any individual can take away its property, with or without compensation, for the private use of any one.[11]

[4] There remains one pendant to the main case. Plaintiff complains of defendant's circulars to the trade as an embargo or boycott. There is no proof that defendant refused or threatened to refuse to sell to any one who sold to plaintiff; it did request its chosen customers not to deal with plaintiff.

If it had good right to refuse dealings itself with plaintiff, and without malice asked other people to do the same thing, so far only as Cream of Wheat was concerned, defendant was within its rights. "Embargo" is a word without meaning in private law; as to "boycott" I have stated my views at some length in Gill Engraving Co. v. Doerr (D. C.) 214 Fed. 111. Limiting the discussion to goods of defendant's own making, the opinion in U. S. v. Keystone Watch Co. (D. C.) 218 Fed. 502, does not bear out plaintiff's contention. See, also, Montgomery Ward & Co. v. South Dakota, etc., Co. (C. C.) 150 Fed. 413.

The motion is denied in all its parts.

Note.—Aided by counsel, I have examined all the public documents I could find relative to the Clayton Act, hoping to find something of assistance in interpreting the statute. The point raised by this motion was not, so far as I know, discussed or considered.

---

[11] It is an interesting speculation whether national price regulation, embracing compulsory sales, could not be reached by a system of federal licenses as a prerequisite for interstate business. Semble that submission to such prospective regulatory orders might be exacted as the price of license.