UNITED STATES v. COLGATE & CO.

(District Court, E. D. Virginia. October 29, 1918.)

1. MONOPOLIES ⬤⟶17(2)—COMBINATION IN RESTRAINT OF TRADE—ANTI-TRUST ACT.

    . A manufacturer of products shipped in interstate trade is not subject to criminal prosecution, under Sherman Anti-Trust Act July 2, 1890 (Comp. St. 1916, § 8820 et seq.), for entering into a combination in restraint of such trade, because he agrees with his customers upon prices, claimed by them to be fair and reasonable, at which the products may be resold, and declines to sell to those who will not so agree.

2. MONOPOLIES ⬤⟶31—ANTI-TRUST ACT—INDICTMENT FOR ILLEGAL COMBINATION.

    An indictment against a manufacturer alone, charging a combination in restraint of trade in violation of Sherman Anti-Trust Act July 2, 1890 (Comp. St. 1916, § 8820 et seq.), which averred only that defendant required its customers, to whom it sold its products, individually and not collectively, to sell at established prices, not alleged to be unreasonable, and refused to sell to customers who would not so agree, which did not charge that defendant had or attempted to acquire a monopoly, that it retained any control over the purchasers, or the goods after their sale, or any interest therein, or the right to control the disposition of the same, or that there was any combination or agreement between the customers themselves, *held* not to charge an offense.

3. MONOPOLIES ⬤⟶31—INDICTMENT—COMBINATION IN RESTRAINT OF TRADE.

    An indictment for combination in restraint of trade, which charged generally that defendant, a manufacturer, entered into agreements with customers to whom it sold its products to maintain prices, but which did not join such customers, nor aver that their names were unknown, nor set out any particular transaction, *held* too general and insufficient for want of certainty.

Criminal prosecution by the United States against Colgate & Co., a corporation. On demurrer to indictment. Demurrer sustained.

G. Carroll Todd, Asst. Atty. Gen., and Henry S. Mitchell, Sp. Asst. Atty. Gen., Richard H. Mann, U. S. Atty., of Petersburg, Va., and Hiram M. Smith, Asst. U. S. Atty., of Richmond, Va.

Charles E. Hughes, of New York City, Harry K. Wolcott and Menalcus Lankford, both of Norfolk, Va., and Charles Wesley Dunn and Mason Trowbridge, both of New York City, for defendant.

WADDILL, District Judge. The indictment in this case charges in a single count that the defendant is a corporation organized and existing under the laws of the state of New Jersey, and having its general offices, factories, and salesrooms at Jersey City, in said state, and there engaged in producing laundry soaps, toilet soaps, and other toilet articles, and selling and shipping such products to wholesale and retail dealers in the Eastern district of Virginia, and throughout the United States; that during the period of three years immediately preceding the return of this indictment, to wit, on the 18th day of December, 1917, it did knowingly and unlawfully create and engage in a combination with the aforesaid wholesale and retail dealers within said Eastern district of Virginia, and throughout the United States, to procure adherence on the part of said wholesale and retail dealers in

the products of the defendant, in selling such products sold to them as aforesaid, to resale prices fixed by the defendant, and to prevent such dealers from reselling at lower prices such products sold to them as aforesaid, thus to suppress competition amongst such wholesale dealers, and among such retail dealers, and that prices were thereby maintained and enhanced to the consuming public, in violation of the act of Congress entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, commonly known as the Sherman Anti-Trust Act (26 Stat. 209, c. 647 [Comp. St. 1916, § 8820 et seq.]).

The demurrer presents for the consideration of the court two questions: (1) Whether the indictment charges a criminal offense under the act referred to; and (2) if so, are the averments of the indictment made with the accuracy, definiteness, and sufficiency that the law requires in setting forth a criminal charge, in order that the defendant may be advised of just what offense he is charged with.

[1] Considering the first proposition, the government insists that, while the indictment does not descend into all the particulars of the alleged crime, it does specify the means by which the combination was formed and carried out, sufficiently to show the offense charged, namely: (1) Distributing telegrams, lists, etc., of uniform resale prices; (2) urging the dealers to adhere to those prices; (3) informing them that defendant would refuse to sell to those who did not so adhere; (4) requesting them to inform it of sales at other prices; (5) discovering and investigating sales of that character; (6) placing the names of dealers who made such sales on "suspended lists"; (7) requesting those dealers to give assurances and promises to adhere in future to the indicated prices; (8) refusing to sell to those dealers until they gave such assurances and promises; (9) selling to such dealers upon their giving such assurances and promises; (10) requesting such assurances and promises from new dealers when opening accounts; and (11) freely selling to those dealers who observed the indicated prices.

Defendant's counsel urge that many of the acts alleged are immaterial, and that when the charge is analyzed, so far as the manufacturer's conduct is concerned, it amounts only to this:

That "a manufacturer who simply declines to sell to dealers who fail to charge fair and reasonable resale prices, indicated by the manufacturer, which are of vital importance to the industry and trade, is subject to criminal prosecution as a violator of the Sherman Act, in case it appears that dealers generally resell at such fair and reasonable prices."

The government contends that the offense charged does not consist in refusing to sell to price cutters, but in forming an unlawful combination to procure adherence to universal resale prices, and that the essential difference in law between the proposition that it is unlawful for a manufacturer to combine with dealers in its product, for the purpose of maintaining resale prices fixed by him, and that of the refusal of a manufacturer to sell to dealers who fail to observe resale prices indicated by him, is at once apparent.

Considering the case from the government's standpoint, namely, that

of a combination on the part of the defendant with its retail customers to procure adherence to its uniform resale prices, the omissions from the indictment, as applicable to the charge of combination and conspiracy in restraint of trade, at once become apparent. No suggestion is made that the conduct complained of was a monopoly, or was an attempt to monopolize the trade in toilet and laundry soaps, and other articles referred to; that the defendant was in a position to effect such purpose; that its business bore any appreciable proportion to the general extent of the business in question; or that the defendant was under any special duty or obligation to the public, not applicable to all citizens alike in other private businesses, to manufacture its products. There is no charge that the defendant acted in what it did in concert with other manufacturers of soaps, or with other than its own customers separately, or that the prices sought to be maintained were other than fair; nor was any request made, or assurance given, that customers who gave the assurance would in turn require like assurance from persons to whom they sold, or that buyers giving the assurance would also stipulate to buy only from the defendant, or sell only to customers selected by it; and no charge is made that any contract was entered into by and on the part of the defendant, and any of its retail customers, in restraint of interstate trade and commerce —the averment being, in effect, that it knowingly and unlawfully created and engaged in a combination with certain of its wholesale and retail customers, to procure adherence on their part, in the sale of its products sold to them, to resale prices fixed by the defendant, and that, in connection therewith, such wholesale and retail customers gave assurances and promises, which resulted in the enhancement and maintenance of such prices, and in the suppression of competition by wholesale dealers and retail dealers, and by the latter to the consuming public.

It will be observed that the indictment is solely against the defendant manufacturer, and not against either a wholesaler or retailer with whom it is alleged the combination was made. No citation of authority is furnished the court of any criminal case involving the state of facts charged here, nor in support of the indictment against only one person to the unlawful combination. The government cites numerous cases to sustain their view of the case, among them the following: Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086; Dr. Miles Medicine Co. v. Park & Sons, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; United States v. American Tobacco Co., 221 U. S. 106, 181, 31 Sup. Ct. 632, 55 L. Ed. 663; Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Straus v. Victor Talking-Machine Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955; Thomsen v. Cayser, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322; Boston Store of Chicago v. American Graphophone Co., 246 U. S. 8, 38 Sup. Ct.

257, 62 L. Ed. 551, Ann. Cas. 1918C, 447; United States v. Addyston Pipe Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122; Thomsen v. Union Castle Mail S. S. Co., 166 Fed. 251, 253, 92 C. C. A. 315; United States v. Kellogg Corn Flake Co. (D. C.) 222 Fed. 725, Ann. Cas. 1916A, 78; United States v. U. S. Steel Corporation (D. C.) 223 Fed. 55; Frey & Sons v. Welch Grape Juice Co., 240 Fed. 114, 117, 153 C. C. A. 150.

These are all civil cases, in one form or another, involving the effect of acts alleged to be violative of the laws of commerce and trade, and mainly growing out of breaches of contracts alleged to have been unlawfully entered into, either under patent or copyright laws arising in connection with unfair competition, or because of alleged violation of contracts entered into between litigants in respect to their rights, or what they conceived to be their rights, in matters of trade relations, the subject of interstate commerce. No review of these several cases will be attempted; they are referred to generally in the case, relied on by the government, of Boston Store of Chicago v. American Graphophone Co. et al., 246 U. S. 8, 38 Sup. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447, and to that decision and the review of the cases by the Supreme Court reference is specially made, as it is believed, while bearing on the general subject under consideration, they do not, because of their own peculiar facts, materially affect this case.

In the view taken by the court, the indictment here fairly presents the question of whether a manufacturer of products shipped in interstate trade is subject to criminal prosecution under the Sherman Act, for entering into a combination in restraint of such trade and commerce, because he agrees with his wholesale and retail customers, upon prices claimed by them to be fair and reasonable, at which the same may be resold, and declines to sell his products to those who will not thus stipulate as to prices. This, at the threshold, presents for the determination of the court how far one may control and dispose of his own property; that is to say, whether there is any limitation thereon, if he proceeds in respect thereto in a lawful and bona fide manner. That he may not do so fraudulently, collusively, and in unlawful combination with others, may be conceded. Eastern States Lumber Association v. United States, 234 U. S. 600, 614, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. But it by no means follows that, being a manufacturer of a given article, he may not, without incurring any criminal liability, refuse absolutely to sell the same at any price, or to sell at a named sum to a customer, with the understanding that such customer will resell only at an agreed price between them, and, should the customer not observe the understanding as to retail prices, exercise his undoubted right to decline further to deal with such person.

Authorities to sustain this view might be cited almost without number, and only some of the federal decisions bearing strictly thereon will be mentioned. In an early decision construing the Sherman Act, rendered long before the Clayton Act (Act Oct. 15, 1914, c. 323, 38 Stat. 730) was passed, and which latter act is not involved here (Transatlantic Missouri R. R. Case, 166 U. S. 326, 17 Sup. Ct. 551, 41 L.

Ed. 1007), Mr. Justice Peckham, in distinguishing between a public carrier or calling and a business like the one here involved, said:

"The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases; he may charge different prices for the same article to different individuals; he may charge as much as he can get for the article in which he deals, whether the price be reasonable or unreasonable; he may make such discrimination in his business as he chooses; and he may cease to do any business whenever his choice lies in that direction."

In Northern Securities Co. v. United States, 193 U. S. 361, 24 Sup. Ct. 466, 48 L. Ed. 679, Mr. Justice Brewer, speaking for the court, said:

"Further, the general language of the act is also limited by the power which each individual has to manage his own property and determine the place and manner of its investment. Freedom of action in these respects is among the inalienable rights of every citizen."

In Standard Oil Co. v. United States, 221 U. S. 56, 31 Sup. Ct. 514, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, Chief Justice White, speaking for the court said:

"From the review just made it clearly results that outside of the restrictions resulting from the want of power in an individual to voluntarily and unreasonably restrain his right to carry on his trade or business, and outside of the want of right to restrain the free course of trade by contracts or acts which implied a wrongful purpose, freedom to contract, and to abstain from contracting, and to exercise every reasonable right incident thereto, became the rule in the English law."

In United States v. American Tobacco Co., 221 U. S. 180, 31 Sup. Ct. 648, 55 L. Ed. 663, the Chief Justice, speaking for the court, said:

"Indeed, the necessity for not departing in this case from the standard of the rule of reason which is universal in its application is so plainly required, in order to give effect to the remedial purposes which the act under consideration contemplates and to prevent that act from destroying all liberty of contract and all substantial right to trade, and thus causing the act to be at war with itself by annihilating the fundamental right of freedom to trade which, on the very face of the act, it was enacted to preserve, is illustrated by the record before us."

In Dueber Watch Case Co. v. Howard Watch, etc., Co., 66 Fed. 646, 14 C. C. A. 22 (C. C. A. 2d Circuit), the court said:

"An individual manufacturer or trader may surely buy from or sell to whom he pleases, and may equally refuse to buy from or to sell to any one with whom he thinks it will promote his business interests to refuse to trade."

In Union Pacific Coal Co. v. United States, 173 Fed. 739, 97 C. C. A. 580 (C. C. A. 8th Circuit), the court said:

"There was no law which required the coal company to sell its coal to Sharp on the terms which he prescribed, or to sell it to him at all. It had the undoubted right to refuse to sell its coal at any price. It had the right to fix the prices and the terms on which it would sell it, to select its customers, to sell to some and to refuse to sell to others, to sell to some at one price and on one set of terms, and to sell to others at another price and on a different set of terms. There is nothing in the act of July 2, 1890, which deprived the coal company of any of these common rights of the owners and venders of merchandise, and, if it did not combine with some other person or persons so to do, its refusal to sell its coal to Sharp, unless he would withdraw his

advertisement of a reduction in his retail price of it, was not the violation of the Sherman Anti-Trust Act charged in the indictment."

The case of Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co. (D. C.) 224 Fed. 566, on appeal 227 Fed. 46, 141 C. C. A. 594 (C. C. A. 2d Circuit), will be found to contain a comprehensive and able discussion of the right of manufacturers to sell their wares or not, to fix retail prices, or to decline dealing with any particular retailer. To these cases, and the authorities therein cited, and especially to the able discussion by Judge Hough on pages 572–575 of the first report (224 Fed. 566, supra), attention is especially drawn.

[2] The pregnant fact should never be lost sight of that no averment is made of any contract or agreement having been entered into whereby the defendant, the manufacturer, and his customers, bound themselves to enhance and maintain prices, further than is involved in the circumstance that the manufacturer, the defendant here, refused to sell to persons who would not resell at indicated prices, and that certain retailers made purchases on this condition, whereas, inferentially, others declined so to do. No suggestion is made that the defendant, the manufacturer, attempted to reserve or retain any interest in the goods sold, or to restrain the vendee in his right to barter and sell the same without restriction. The retailer, after buying, could, if he chose, give away his purchase, or sell it at any price he saw fit, or not sell it at all; his course in these respects being affected only by the fact that he might by his action incur the displeasure of the manufacturer, who could refuse to make further sales to him, as he had the undoubted right to do. There is no charge that the retailers themselves entered into any combination or agreement with each other, or that the defendant acted other than with his customers individually. It cannot be said that the defendant has no interest in the prices at which its goods shall be sold. On the contrary, it had a vital interest, in so far as cutting the same would tend to demoralize the trade, and might have been more injuriously affected by the result of this disorganization than the public would be benefited by a temporary reduction in the prices of its products. The sale of the defendant's particular soaps cannot be said to be a necessity, or that the same bears a large proportion to the entire manufacture of soaps of the kind and grade involved. The successful prosecution of the defendant's business, and the continued use of its soap by the public, depend upon its ability to find and maintain a market for its output. Price cutting would almost inevitably result in reducing the defendant's business in a given community to only those engaged in that practice, and deprive it of the patronage of the great body of wholesalers and retailers engaged in what they believed to be a fair and legitimate conduct of their business. It by no means follows that, in the end, the public would be benefited, as the price cutter could easily raise prices after the demoralization caused by his conduct had been brought about, and profit individually by so doing. What the public is interested in is that only reasonable and fair prices shall be charged for what it buys, and it is not claimed that the defendant's manner of conducting its business has otherwise resulted.

The indictment should set forth such a state of facts as to make it clear that a manufacturer, engaged in what was believed to be the lawful conduct of its business, has violated some known law, before it is haled into court to answer the charge of the commission of a crime. In the instant case, the court's conclusion is that the averments of the indictment, when carefully considered, and read in the light of the defendant's inalienable right to deal lawfully with his own property, the handling, trading in, and disposing of which is made the subject of this indictment, fail to charge any offense, either in restraint of trade and commerce, under the Sherman Act, or any other law of the United States.

[3] Second. This brings us to the consideration of the form of the indictment. Ordinarily, this would be deemed immaterial, the indictment failing to charge a criminal offense, as held by the court; but it will be perhaps better, if the case is to be reviewed by the appellate court, to have the sufficiency of the indictment also determined.

The indictment, it will be observed, is only against a manufacturer alleged to be in combination with wholesale and retail dealers, and not against the wholesale and retail dealers referred to. It is not averred that the names of the latter were unknown to the grand jury, and no reason is given why they were not made parties defendant. Assuming, but without deciding, that it is permissible to indict only one party in an unlawful combination, it does not seem to the court that the alleged offense with which the defendant is charged is stated and set forth with that degree of accuracy and certainty required in criminal pleading. The facts in no particular combination, against any one set of wholesalers or retailers alleged to have been in combination with the defendant, are given, but merely that assurances and promises were made by the wholesale and retail dealers doing business with the defendant throughout the United States, and the Eastern district of Virginia, that its products would not be resold at retail other than at prices fixed by the defendant. This language is too general, and the defendant has the right at least to be informed of some one particular infraction of the law that it is claimed it has committed. It would be impossible to intelligently prepare a defense or answer to this indictment, as it involves the defendant's dealings with its wholesale and retail customers throughout the territory named, covering a period of three years. This is too indefinite, and there ought to be no difficulty, if such conditions exist, as set forth in the indictment, to name some specific instance of the alleged combination, and state the same in detail.

The demurrer will be sustained, and the indictment quashed.