GREAT ATLANTIC & PACIFIC TEA CO. v. CREAM OF WHEAT CO.

(Circuit Court of Appeals, Second Circuit. November 10, 1915.)

1. WORDS AND PHRASES—"WHOLESALER"—"JOBBER"—"RETAILER."
  A "wholesaler" is one who buys in comparatively large quantities, and who sells, usually in smaller quantities, but never to the ultimate consumer of an individual unit. He sells either to a "jobber," a sort of middleman, or to a "retailer," who sells to the consumer. The quantities bought by the wholesaler may vary from a fraction of a car load to many car loads; it being the character, not of his buying, but of his selling, that marks him as a wholesaler.
  [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Jobber; Retail Dealer; Wholesale Dealer.]

2. MONOPOLIES ⬤⇒17—DISCRIMINATION—STATUTORY PROVISIONS.
  Defendant was engaged in selling under a trade-name purified wheat middlings selected by it and put up in packages. Its whole business covered less than 1 per cent. of the total middlings bought and sold in the country. It decided to sell only to wholesalers, and so announced to the trade, but for a time made an exception as to a particular retailer. It afterwards decided that it would no longer sell to such retailer, and did not thereafter sell to him. *Held*, that this was not unlawful, and such retailer was not entitled to an injunction restraining defendant from refusing to sell its goods to it, and it was wholly immaterial why it ceased to sell to such retailer, as neither the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209) nor the Clayton Act (Act Oct. 15, 1914, c. 323, 38 Stat. 730) has changed the rule that a trader may reject the offer of a proposing buyer for any reason that appeals to him, whether it be because he does not like the buyer's business methods, or because of some personal difference.
  [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ⬤⇒17.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from an order refusing to grant an injunction restraining defendant from refusing to sell its goods to

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

complainant. The facts are quite fully set forth in the opinion of Judge Hough, which is reported in 224 Fed. 566.

Griggs, Baldwin & Baldwin, of New York City (Martin Conboy, Joseph F. Collins, and Frank A. Clary, all of New York City, of counsel), for appellant.

Joseph J. Baker, of New York City (Rome G. Brown, of Minneapolis, Minn., of counsel), for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. Briefly summarized the facts are these: In the production of wheat flour from wheat, there is a sort of by-product, known as "purified middlings." It is produced by every flouring mill in the United States engaged in the manufacture of wheat flour; it is a staple commodity regularly quoted and dealt in in all grain markets. Defendant buys "purified middlings," selecting such as it thinks grade high in quality. Without submitting them to any process or treatment, without adding anything to them, it puts up the middlings which it selects in packages and offers its selection to the trade under the name "Cream of Wheat." That name identifies packages containing middlings of defendant's selection, and it has protected its trade-name for such selection by a copyright covering the carton in which the cereal is packed. Either because it has used good judgment in its selection, or because it has well advertised its trade-mark, it finds a ready market for its packages. Its particular selection, however, amounts to less than 1 per cent. of the total purified middlings bought and sold in this country.

With an exception which will be referred to later, defendant makes no sales to consumers or to retailers, but confines its sales exclusively to wholesalers, to whom it charges two prices, $3.95 per case in car load lots and $4.10 per case in less than car load lots. To each purchaser from it, it sends a circular requesting such purchaser to sell to the retail trade only at a price of $4.50 per case, adding to this request the statement that it does not intend to waive the right to refuse at any time to supply any dealer who shall fail to comply with any request made by it, the infringement of which defendant may deem prejudicial to the interests of the consumer, to defendant's own business, or to the trade at large. Complainant contends that defendant's course of conduct is a violation of the Sherman Anti-Trust Act and that under the recent Clayton Act this suit may be instituted and maintained by complainant.

That branch of the case has been most elaborately argued; it was discussed by the District Judge. We do not find it necessary to go into it, as we are satisfied that complainant is not entitled to the relief now asked for.

[1] As was stated before, defendant has elected not to sell to consumers or retailers, but to confine its sales exclusively to wholesalers. There is nothing unusual about such a course of business, and certainly it is no offense against common law, statutes, public policy, or good morals for a trader to confine his sales to persons who will buy from him in large quantities. A "wholesaler" is one who buys in compara-

tively large quantities and who sells, usually in smaller quantities, but never to the ultimate consumer of an individual unit. He sells either to a "jobber" (a sort of middleman) or to a "retailer"; the latter being the one who sells to the consumer. The "large" quantities bought by the wholesaler may vary greatly—from a fraction of a car load to many car loads; the character, not of his buying, but of his selling, marks him as a wholesaler. If occasionally, in some particular business, this term loses somewhat of its original significance, such manifestly, as the record shows, is not the fact with the business now under consideration.

Upon the proof and the admissions in the record, this complainant is not a wholesaler, but a retailer; it does not confine its sales to retailers, but sells to countless consumers—a package at a time for 12 cents.

[2] Defendant, as we have seen, in the conduct of its business, decided and made announcement to the trade that for reasons sufficient to itself it would sell only to wholesalers. Why, if it chose to do so, it could not make such a rule and adhere to it, we are at a loss to understand. It named the prices at which it would sell to wholesalers, so much in car load lots, so much in less than car load lots. That certainly it had a right to do; the Clayton Act itself expressly recognizes the existence of this right. Under the rule which defendant had legitimately established for the conduct of its own business, complainant could not buy from it, because complainant was a retailer. Nevertheless, for a time, defendant made an exception to its rule, and sold to complainant, under some arrangement, which, as defendant thought, would not make the wholesalers with whom it dealt critical of the exception. On a certain day defendant decided that it would no longer sell to this retailer at all, and since then it has not sold to complainant. There was no contract between the two which bound defendant to sell to complainant for any specified period of time. This suit is really brought to force defendant to continue to sell to this single retailer, as it sells to the wholesalers who trade with it.

Much has been said about the reason why defendant ceased to treat complainant as an exception to its rule; failure of the latter to live up to some arrangement, etc. All that seems to be wholly immaterial. The business of defendant is not a monopoly, or even a quasi monopoly. Really it is selling purified wheat middlings, and its whole business covers only about 1 per cent. of that product. It makes its own selection of what by-products of the milling process it will put up, and sells what it puts up under marks which tell the purchaser that these middlings are its own selection. It is open to Brown, Jones, and Robinson to make their selections out of the other 99 per cent. of purified middlings and put them up and sell them; possibly one or more of them may prove to be better selectors than defendant, or may persuade the public that they are. It is difficult to see how into such a business as that any novel and exceptional rule of law is to be imported. We had supposed that it was elementary law that a trader could buy from whom he pleased and sell to whom he pleased, and that his selection of seller and buyer was wholly his own concern. "It is a

part of a man's civil rights that he be at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice." Cooley on Torts, p. 278. See, also, our own opinion in Greater New York Film Co. v. Biograph Co., 203 Fed. 39, 121 C. C. A. 375.

Before the Sherman Act it was the law that a trader might reject the offer of a proposing buyer, for any reason that appealed to him; it might be because he did not like the other's business methods, or because he had some personal difference with him, political, racial, or social. That was purely his own affair, with which nobody else had any concern. Neither the Sherman Act, nor any decision of the Supreme Court construing the same, nor the Clayton Act, has changed the law in this particular. We have not yet reached the stage where the selection of a trader's customers is made for him by the government.

The order is affirmed.