STANDARD FASHION CO. v. MAGRANE HOUSTON CO. *

(District Court, D. Massachusetts. March 9, 1918.)

1. SALES ⊙—7—CONSTRUCTION OF CONTRACT—SALE OR AGENCY.
    A contract by which defendant, a mercantile company, was in terms designated as agent for sale of complainant's patterns, but which required defendant to pay for the patterns when received at stated prices, with the privilege of returning those unsold each six months at a reduced price for exchange, *held* one of sale, and not of agency.

2. MONOPOLIES ⊙—17(2)—CLAYTON ACT—RESTRICTION ON COMPETITION.
    A contract for the sale of patterns to a retail store for a term of years, during which it agreed to buy and keep on hand a certain quantity at all times, and "not to sell or permit to be sold on its premises during the term of the contract any other make of patterns and not to sell Standard patterns, except at label prices," *held* illegal and void, as in violation of Clayton Act, § 3 (Comp. St. 1916, § 8835c).

In Equity. Suit by the Standard Fashion Company against the Magrane Houston Company. Decree for defendant.

Storey, Thorndike, Palmer & Dodge, of Boston, Mass., for plaintiff.

James W. Sullivan, of Lynn, Mass., for defendant.

JOHNSON, Circuit Judge. November 25, 1914, the plaintiff entered into a contract with the defendant, containing, among others, the following provisions:

"The first party hereof grants to second party an agency for the sale of Standard patterns for their store in the city of Boston, state of Massachusetts, for a term of two years from date hereof, and from term to term thereafter until this agreement is terminated, as hereinafter provided, and agrees to sell and deliver f. o. b. New York or at its branch office in Boston, Mass., to second party, Standard patterns, at a discount of 50 per cent. from retail prices, and advertising matter at the prices and on the conditions named on the reverse side hereof; also such other publications as may be issued by first party at regular agents' rates; to allow second party to return discarded patterns semiannually between January 15th and February 15th, and July 15th and August 15th, in exchange, at nine-tenths cost, for other patterns to be shipped at the time of return or thereafter, but not in exchange for other goods than patterns. Patterns returned for exchange must have been purchased by second party from first party direct, and must be delivered in good order to first party at its general office in New York."

In consideration of the above the second party agreed to purchase a certain number of Standard fashion sheets and handy catalogues per annum and to pay transportation charges on same, and on all goods ordered or returned, and to purchase and keep on hand at all times, except during periods of exchange, $1,000 value in Standard patterns, at the net invoice prices, and to pay first party for the first order of pattern stock $500, thirty days after shipment of the same, it being agreed that the balance of the purchase price, $500, should remain unpaid as a standing credit during the continuance of the agreement and become due and payable at its termination, upon which sum the second party agreed to pay interest at the rate of 3 per cent. per annum on January 15th of each year, and to pay for all other

⊙—For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Judgment affirmed, 251 Fed. 559.

purchases on or before the 15th day of the month succeeding the date of shipment.

The second party also agreed—

"not to sell or permit to be sold on its premises during the term of the contract any other make of patterns, and not to sell Standard patterns except at label prices."

The contract contained this provision in regard to its termination:

"Either party desirous of terminating this agreement must give the other party 3 months' notice in writing within 30 days after the expiration of any contract period, as above specified, the agency to continue regularly during such three months."

No notice of its desire to terminate the contract was given by the defendant to the plaintiff within 30 days after the expiration of the first period of 2 years after the date of the contract; but on April 7, 1917, it gave to the plaintiff notice in writing of its decision to terminate the sale of Standard patterns in 3 months from the date of the notice, and about the 1st of July, 1917, discontinued the sale of the Standard patterns and placed on sale in its store patterns made by the McCall Company.

In its bill the plaintiff prays that the defendant may be enjoined until February 25, 1919, the earliest date at which it claims the contract can be terminated—

"from advertising, selling or distributing the patterns, periodicals, catalogues and other literature or printed matter of said McCall Company or any pattern manufacturer other than the plaintiff, and from using its store, business, agents, clerks, parties or connections to further advance the interests of the said McCall Company or any other pattern manufacturer other than the plaintiff, and from permitting to be sold at said store during the term of said contract, and until the aforesaid date, any make of patterns other than those of the plaintiff."

The plaintiff also asks to be awarded "such damages as may be ascertainable."

The defendant claims:

(1) That the contract was terminated on July 7, 1917, by the notice given by it on April 7, 1917.

(2) That the contract is one for sale and that, because it contains the negative covenant "not to sell or permit to be sold on the premises of second party during the term of the contract any other make of patterns," it is in violation of Act Oct. 15, 1914, c. 323, § 3, 38 Stat. 731 (Comp. St. 1916, § 8835c), known as the Clayton Act.

[1, 2] I find that the defendant did not give notice of its desire to terminate the contract in accordance with its provisions, and that it would continue in force until terminated as therein provided, unless it can be successfully attacked by the defendant as unlawful under section 3 of the Clayton Act, which is as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof or the District of Columbia or any insular possession

or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

If an agency only were created by the contract in question it is clear that the provisions of this act would not apply, because by. its terms it is made applicable only to leases, sales or contracts for sale. Although the plaintiff, by the terms of the contract, grants to the defendant an agency for the sale of Standard patterns, the court will search beneath the language employed to discover the real nature of the contract and will place its own construction upon it without reference to its characterization by the parties themselves.

The plaintiff in fact agreed to sell and deliver to the defendant—

"Standard patterns at a discount of 50 per cent. from retail prices and advertising matter at the prices and on the conditions named * * * also such other publications as may be issued by first party at regular agents' rates."

All transportation charges and expenses of sale were to be paid by the defendant. No accounting by the defendant to the plaintiff was required. While the defendant had the right to return discarded patterns between January 15th and February 15th, and between July 15th and August 15th in each year, and could receive in exchange nine-tenths of their cost in other patterns, there is nothing in the contract to compel it to make the exchange, and patterns which are returned for exchange must have been purchased by the second party from first party direct.

One-half the contract price to be paid for the first order of patterns was entered upon the books of the plaintiff company as an obligation which the defendant was to pay at the termination of the contract, and upon which it agreed to pay interest yearly. No condition was to be performed by the defendant before the title to the patterns delivered would vest in it, and the fact that the defendant could return discarded or unsold patterns in no way prevented the title to the patterns from vesting absolutely in the defendant. While the defendant agreed to return unsold patterns at the termination of the contract, yet this right of return was evidently inserted for its benefit rather than to insure the return of patterns to the plaintiff, for the contract provides:

"That neglect to return the pattern stock within two weeks after expiration of three months notice shall relieve first party from all obligation to redeem the same."

That it was the intent and understanding of the parties to the contract that this return of unsold patterns constituted a repurchase by the plaintiff, plainly appears from the typewritten section which appears upon the back of the contract, by which it is provided that in case the premises of the defendant company or a substantial part

of the same should be sold, the defendant company should have the privilege of terminating the contract, and "may" then deliver its stock of patterns to the plaintiff "for repurchase under the repurchase clause of this contract."

It will be noted that the defendant is not compelled by this provision to return its unsold stock, but that it "may deliver" the same to the plaintiff "for repurchase." The purpose of the whole contract is plainly to sell patterns at a reduced rate to the defendant on the condition that it will resell at the retail prices fixed by the plaintiff, and also refrain from selling the goods of any other pattern manufacturer. The credit extended for one-half the purchase price of the original order for patterns is intended to serve the purpose of holding the defendant to its contract.

The reports of the judiciary committees of the House of Representatives and the Senate accompanying the Clayton Act were introduced in evidence for the purpose of showing that it was not the intent of Congress to include "exclusive agencies" within the scope of the act. They contain this statement relative to the purpose of the act:

"It not only does not prohibit or forbid exclusive agencies, but on the contrary it in no way whatsoever relates to agencies, properly so termed."

It will be noticed that the committees were very careful to state that only "agencies, properly so termed," are excluded from the provisions of the act.

I do not think the contract establishes an agency, "properly so termed," although it is made to assume this aspect in some of its features, but that it is a contract for sale; and in this view I find support in the recent opinion of the Supreme Court in Straus et al. v. Victor Talking Machine Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955, and of Circuit Judge Knappen in Ford Motor Co. v. Union Motor Sales Co. et al., 244 Fed. 156, 156 C. C. A. 584.

Counsel for the plaintiff relies upon Wilcox & Gibbs Co. v. Ewing, 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882, as decisive of the question whether the contract was one of agency or one for sale; but admitting under the authority of this case that the defendant was created an agent for certain purposes, it is also nevertheless true that the contract contained an agreement for an absolute sale of patterns and the plaintiff's publications to the defendant as its agent.

If the contract is one for sale, is it unlawful under the Clayton Act because its effect "may be to substantially lessen competition or tend to create a monopoly"?

Neither the Supreme Court nor any other court of last resort has yet passed upon section 3 of the Clayton Act.

The cases from state courts that have been cited by the plaintiff were all decided before the passage of the Clayton Act and all dealt with the construction of a state statute, and therefore afford no assistance in the construction of a statute which is declared to be supplemental to the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209), after a construction had been placed by the Supreme Court upon

that act by which the restraint of trade prohibited by it was declared to be an unreasonable restraint.

In Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 227 Fed. 46, 141 C. C. A. 594, the court had under consideration section 2 of the Clayton Act, which deals with discriminations between different purchasers in the sales of commodities and makes such discriminations unlawful—

"where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The last clause of the section, however, provides:

"That nothing herein contained shall prevent persons engaged in selling goods * * * from selecting their own customers in bona fide transactions and not in restraint of trade."

The court there held that it was not unlawful for the Cream of Wheat Company to refuse to sell its product to retailers and confine its sales exclusively to wholesalers, and held that "neither the Sherman Act, nor any decision of the Supreme Court construing the same, nor the Clayton Act, has changed the law in this particular," and found it unnecessary to go into a consideration of the Clayton Act, which was discussed by District Judge Hough when the case was before him, and whose opinion in 224 Fed. 566, is cited upon the brief of counsel for the plaintiff.

In Motion Picture Patents Co. v. Universal Film Manufacturing Co., 235 Fed. 398, 148 C. C. A. 660, it was claimed in the Circuit Court that the contract there under consideration was unlawful because in violation of section 3 of the Clayton Act, and Judge Hand said:

"If the prohibitions of the Clayton Act mean anything at all, this case falls within them, and the restrictions as to use of films other than complainant's with the projecting machines are therefore void.

"Indeed, the report of the Judiciary Committee of the House concerning the Clayton Act shows that its purpose is to reach the film monopoly."

When the case reached the Supreme Court, however, it was decided upon other grounds, the court stating its conclusion as follows (243 U. S. 502, 517, 37 Sup. Ct. 416, 421 [61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959]):

"Our conclusion renders it unnecessary to make the application of this statute to the case at bar which the Circuit Court of Appeals made of it; but it must be accepted by us as a most persuasive expression of the public policy of our country with respect to the question before us."

In the dissenting opinion of Mr. Justice Holmes he also "leaves on one side the question of the effect of the Clayton Act."

In Coca-Cola Co. v. J. G. Butler & Sons (D. C.) 229 Fed. 224, Judge Trieber found that the refusal of the Coca-Cola Company to sell its syrup for bottling to other than its licensed bottlers and permit such parties to use its trade-mark in connection with the bottled product was not a violation of the Clayton Act, in view of the possibility of adulteration and the hardship to the manufacturer in maintaining

254 F.—32

such supervision over the bottling as it deemed necessary if required to sell to every intending purchaser.

In Pictorial Review Co. v. Curtis Publishing Co., 255 Fed. 206, decided June 23, 1917, Judge Hand found that the Curtis Publishing Company had established a system for the promotion of the sale oi its publications by forming a "league of Curtis salesmen," and that a restriction in its contract with district agents or wholesalers of the defendant's publications that they should not sell to the Curtis newsboys publications other than those of the defendant without first obtaining the defendant's approval, was not in violation of the Clayton Act; but his decision was placed upon the ground that the league of newsboys had been formed by the Curtis Company through its "ingenuity, labor and capital," and that the complainant was attempting to secure a preliminary injunction in order that it might avail itself of the plaintiff's system for the sale of its own publication, and that in making this attempt the complainant is itself engaging in unfair trade. He intimates in the following language, however, what his opinion might be if nothing but a sale were involved:

"If nothing but a sale were involved, I might support plaintiff's contention that defendant has violated the Clayton Act by preventing these wholesale dealers from selling the Pictorial Review through subdealers and boys."

In United States v. United Shoe Machinery Co. (D. C.) 234 Fed. 127, 150, District Judge Trieber, after having quoted part of the opinion of the Supreme Court in the Standard Oil Company Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, discusses the Clayton Act as follows:

"On the other hand, the act now under consideration, instead of using the generic words of the Sherman Act, in plain and unequivocal language states what acts shall be unlawful, if they 'substantially lessen competition or tend to create a monopoly.' This being the case, the presumption is, not that Congress intended that the construction of the Sherman Act should control, but, on the contrary, that it should not control. Had Congress intended that the construction placed upon the Sherman Anti-Trust Act in those cases should apply to the Clayton Act, it would have used the same or like generic words, instead of defining what acts shall be unlawful, if the natural result of such acts tends to substantially lessen competition or create a monopoly in any line of commerce. * * *

"Evidently Congress was not satisfied to only prohibit actual lessening of competition, or monopolizing, but to make it unlawful for any person to do those acts, which may put it in his power to do so."

The Clayton Act is entitled:

"An act to supplement existing laws against unlawful restraints and monopolies and for other purposes."

The report of the Senate committee of the judiciary upon the bill contains the following statement of its purpose:

"Broadly stated the bill in its treatment of unlawful restraints and monopolies seeks to prohibit and make unlawful certain trade practices, which as a rule singly and in themselves are not covered by the act of July 2, 1890, or other existing anti-trust acts, and thus by making these practices illegal, to arrest the creation of trusts, conspiracies and monopolies in their incipiency and before consummation."

While the Clayton Act reaffirms the general terms of the Sherman Act as construed by the United States Supreme Court in the Standard Oil Company Case, supra, and American Tobacco Company Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, it goes further and deals in specific terms with certain acts and practices which are declared by it to be unlawful if their effect may be "to substantially lessen competition or tend to create a monopoly."

The court is not to inquire into the wisdom of such legislation, and in Standard Manufacturing Co. v. United States, 226 U. S. 20, 49, 33 Sup. Ct. 9, 57 L. Ed. 107, its duty is clearly stated by Mr. Justice McKenna:

"The law is its own measure of right and wrong, and what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intentions of parties, and it may be, of some good results."

I am satisfied with the reasoning of Judge Trieber that Congress, with the full knowledge of the construction which had been placed upon the Sherman Act by the Supreme Court, did not intend that the same construction should be placed upon the specific terms of the Clayton Act; for it chose to define the lessening of competition which it declared to be unlawful, and to do this used the word "substantially" to make it apparent that a real, as opposed to an imaginary or fanciful lessening of competition, was intended.

Doubtless a substantial lessening of competition would amount to an unreasonable restraint of trade; but I do not think it is the duty of the court to find this before it can pronounce a contract unlawful, the effect of which it has found may be to "substantially lessen competition." The reports of the committees of both houses of Congress, as well as the legislative history of the bill, show the intent of Congress to protect the public from practices which it believed to be inimical to the public good by preventing these practices from being put in operation.

I think, therefore, it is the duty of the court to determine whether or not the contract has provided means for a real or substantial lessening of competition, irrespective of what use has been or is being made of these means.

By the use of the word "may" the intent is manifest to deal with the potential evil which a contract may contain, and to make the attempt to substantially lessen competition unlawful.

The contract must be considered as part of a widely extended system and a conclusion reached as to the legality of the system. There are in the United States and Canada about 52,000 so-called pattern agencies, and of these the plaintiff and two other companies allied with it through a common holding company control about 20,000, with all of whom a contract like the one we are considering is in force.

The contract by its terms destroys all competition in the sale of patterns and establishes a complete monopoly in the territory which it covers—a large retail dry goods store at the corner of Temple Place and Washington street, in the center of the dry goods district of a large city.

The plaintiff has made a contract containing a like negative covenant with R. H. White Company, whose store is nearly opposite the defendant's store upon Washington street, both of which stores the plaintiff claims are very desirable locations for the sale of its patterns, because goods are sold there from the piece for the manufacture of women's and children's clothing by use of patterns.

If the plaintiff could make a contract like the one under consideration with all the proprietors of retail dry goods stores in this district, it would have a complete monopoly of the sale of patterns in it, and there is nothing in the contract to prevent it doing this, or even covering the whole state of Massachusetts or the whole country. If there were but one dry goods store in a village and the plaintiff could make this contract with the proprietor of that store, it would secure a practical monopoly of the pattern business in that village.

I am of the opinion that the negative covenant in the contract is prohibited by the Clayton Act, and therefore that the bill should be dismissed, with costs to the defendant.

A decree in accordance with the above may be submitted.