*M. B. Eubanks, L. A. Dean, Lamar Camp,* contra.

---

13604, 13613.   BURKHALTER *v.* FORD MOTOR COMPANY; and *vice versa.*

Upon the issue formed by the traverse to the sheriff's return of service of the process, the court, under the evidence, was right in holding that the person upon whom the process was served was not an agent of the defendant, a foreign corporation, and in finding in favor of the traverse.

DECIDED FEBRUARY 15, 1923.

Traverse of service; from city court of· Reidsville — Judge Cowart. April 18, 1922.

*H. H. Elders, J. V. Kelley,* for plaintiff.

*William L. Clay,* for defendant.

BELL, J.   W. T. Burkhalter filed suit against the Ford Motor Company in the city court of Reidsville. The return of service by the sheriff, after an amendment thereto, was as follows: " Georgia, Tattnall County. I have this day served the Ford Motor Company with a copy of this petition and process by serving its agent H. C. Beasley in person with a copy of this petition and process.   J. A. Kennedy, Sheriff, City Court of Reidsville." The Ford Motor Company made a special appearance solely for the purpose of traversing this return or entry. It denied that there had been any service on it as therein declared, and denied that H.

C. Beasley was its agent. The issue thus formed was submitted to the judge, by consent, as the sole trior, and after hearing the evidence a finding and judgment was rendered by him in favor of the traverse. Burkhalter filed a motion for a new trial. This was overruled, and the case is here upon his bill of exceptions to that judgment.

The defendant, as the evidence shows, is a foreign corporation, and the only question here for determination is whether it was doing business in the State, and, if so, whether Beasley was its agent in the transaction of that business. *Vicksburg &c. Ry. Co.* v. *DeBow,* 148 *Ga.* 738, 742 (98 S. E. 381) ; Peterson v. Chicago &c. R. Co., 205 U. S. 364 (27 Sup. Ct. 513, 51 L. ed. 841). But if Beasley was not an agent of the defendant in any sense, the consideration need go no further. Inasmuch as the question may be one of considerable importance, we think it proper to set forth all of the material evidence which was adduced upon the trial. Omitting unnecessary details, this evidence was as follows: The evidence of H. C. Beasley was to the effect that he was engaged in the sale of automobiles under a contract with the Ford Motor Company, that he delivered, with each car sold, the company's warranty which is printed on the back of the buyer's order, and that the company has a right to check up all orders and see what he is doing. " They keep control over their agents, over their dealers." " When I get cars from the Ford Motor Company I pay for them at the bank, bill of lading attached to the draft, order-notify bill of lading, and I can't get the cars until I pay for them." " It is after I have purchased the cars and paid the drafts that I make deliveries of sales that I have made." " When I sell cars I am selling cars for myself. The price of the product is controlled by the Ford Motor Company." " We are not allowed to sell a car less than the fixed price." He further testified, in effect, that his relations with the Ford Motor Company were limited by a contract, which was introduced in evidence and which is as follows: " Ford Motor Company,

" From Jacksonville Branch, Ford Sales Agreement.

" This agreement made at Highland Park, Michigan, this first day of June, 1921, by and between the Ford Motor Company, a Delaware Corporation, of Highland Park, Michigan, hereinafter known as the manufacturer, and Beasley Motor Company, located

38

at Reidsville, in the State of Georgia, hereinafter known as the dealer, witnesseth:

" (1)    That manufacturer hereby grants to dealer the privilege of selling Ford automobiles, trucks, chassis, Fordson tractors, parts and accessories for use within the boundaries of the United States of America, upon the terms and conditions herein specifically set forth.

" (2)    Manufacturer reserves the right to appoint other dealers in any part of the United States of America, and also reserves the right to make direct sales of its products to customers any place in the United States of America without being obligated to pay to any of its dealers a commission upon said direct sales.    Manufacturer reserves the right to sell its products to the United States Government or to any of the departments thereof, or the American Red Cross, without the payment of any discount or commission whatever to dealer, and dealer agrees to immediately turn over to the manufacturer any inquiries or orders received therefrom without any payment or compensation to him therefor, and to make deliveries of the manufacturer's products, as it may direct, without charge for the handling, etc.

" (3)    Dealer agrees to maintain a place of business and proper equipped salesroom and service station for Ford automobiles, trucks, chassis and Fordson tractors, acceptable to the manufacturer, prominently located for the purpose of conducting such business, and shall employ competent salesmen and efficient workmen; and manufacturer shall not in any wise be responsible for any charges connected with such place of business.    Dealer shall maintain only one place of business under this agreement, which shall be at the above-named location.    Dealer also agrees to purchase for himself and keep in use at all times at least one Ford automobile, and one Fordson tractor of the current year's model, for the sole purpose of demonstration and exhibition to intending purchasers, and to maintain same at all times in proper running condition and good clean order and repair.    If he sells said demonstrating automobile or tractor before the same shall have been in use three months, dealer agrees that he will sell it on the terms and conditions herein governing the retail sale of new cars and tractors.

" (4)    Dealer agrees to conspicuously display Ford and Fordson signs on and in his building and windows, designating that he is

an ' Authorized Ford and Fordson dealer,' and he shall adequately advertise the manufacturer's products in the local papers and otherwise, and give his immediate and careful attention to all inquiries, and give good representation to all interests of manufacturer. Dealer agrees not to advertise or trade in the manufacturer's product in such a way as to be an annoyance or injurious to it or any of its other duly appointed dealers, and that he will not repeat any advertisements or publish or use any form of advertising matter to which the manufacturer objects, and that he will follow as closely as possible advertising copy suggested from time to time, by the manufacturer. Under no circumstances will dealer be permitted to use the name ' Ford,' or ' Fordson,' as part of his firm or corporate name. When agreement of dealer is cancelled or terminated, he agrees to immediately remove all Ford and Fordson signs and discontinue Ford and Fordson advertising.

" (6)   Manufacturer agrees that the estimate and shipping specifications of the dealer will receive manufacturer's careful attention, but manufacturer does not agree absolutely to fill them, but expressly reserves the right to refuse them from time to time, or such parts of them as manufacturer deems necessary or proper, and all such estimates are subject to delays occurring from any cause whatsoever in the manufacture and delivery of its product, no legal liability to fill such estimates being incurred under any circumstances. And the dealer may cancel, upon one month's written notice to manufacturer, any unfilled part of said estimates."

" (8)   Manufacturer will sell its Ford automobile, trucks, chassis, and Fordson tractors to dealers as hereinafter provided at seventeen and one-half (17½) per cent. discount from its established list price f. o. b. Detroit, Michigan.

" (9)   Dealer shall pay to manufacturer in cash or by accepting and paying sight draft attached to bill of lading, including exchange, the full list price at the time of purchase from manufacturer of its automobiles, trucks, chassis and tractors, less a discount of seventeen and one-half per cent. (17½%). The title to all products, until actually paid for by dealer, shall be and remain in manufacturer.

" (10) Dealer shall pay the freight from Detroit or such branch house as the manufacturer may elect to ship from, and advance freight, to dealer's place of business. Dealer shall pay all expenses

incurred by manufacturer from crating, boxing, packing, double checking and loading its products. All shipments will be at dealer's risk from time of delivery to carrier by manufacturer at place of shipment. Dealer shall collect from retail buyers for freight charges and delivery expenses, $67.00 on each Ford automobile, truck and chassis, and $50.00 on each Fordson tractor sold, in addition to the regular price of such Ford automobile, truck, chassis or Fordson tractor.

" (11) Dealer shall pay (or manufacturer may pay and add to price charged dealer) any taxes or license fees that may be imposed on account of such business or upon dealer's stock, or upon any Ford automobiles, trucks, chassis, Fordson tractors, parts or accessories that may be in dealer's possession or in transit on bill of lading or otherwise, for delivery to dealer, or imposed upon the advertisement, transportation, sale or manufacture thereof.

" (12) Dealer agrees that he will purchase from the manufacturer and carry at his place of business an adequate stock of genuine Ford and Fordson parts at all times during the term of this agreement. Inasmuch as the reputation of Ford automobiles, trucks, chassis and Fordson tractors is often injured by the use therein of parts made by others, manufacturer suggests that all purchases of parts by the dealer shall be made, as to all parts listed in its parts catalog, exclusively from the manufacturer, and that he will not use, sell, or recommend to Ford or Fordson owners or others similar parts manufactured by others.

" (13) Manufacturer agrees to allow the dealer a discount of forty per cent. (40%) on all parts of Ford automobiles, trucks, chassis and Fordson tractors, listed in the Ford and Fordson parts, price list f. o. b. Detroit, Michigan. Dealer agrees to allow a discount of twenty-five per cent. (25%) f. o. b. his place of business on such parts to all public garages and repair shops. Discount of forty per cent. (40%) is allowed in consideration of dealer carrying an adequate amount of stock provided above, selling to public garages and repair shops at a discount of twenty-five per cent. (25%), and faithful performance of the other provisions of this agreement.

" (16) Dealer shall obtain from each purchaser of a Ford automobile, truck, chassis or Fordson tractor a written order, duly signed by the purchaser, upon retail buyer's order after delivery of

such Ford automobile, truck, chassis or Fordson tractor to the customer.. Manufacturer shall have the right at any time to visit dealer's place of business and check up and verify all retail buyer's orders.

" (17)   This agreement shall continue in force and govern all transactions between the parties hereto until cancelled or terminated by either party, but it is agreed that either pary shall have the privilege, with or without cause, to cancel and annul this agreement at any time upon written notice by registered mail, or personal delivery of notice to the other party, and such cancellation shall also operate as a cancellation of all unfilled retail and other orders and requisitions for all products of manufacturer which may have been received by the manufacturer from the dealer prior to the date when such cancellation is served.

" (18) In case of the cancellation or termination of this agreement the manufacturer may, at its option, repurchase from the dealer at the price which he paid therefor, plus freight, all such of the aforesaid new and unused Ford automobiles, trucks, chassis, Fordson tractors, parts and accessories as he may have on hand unsold at the date of such cancellation or termination. Manufacturer shall be entitled to take possession of all such Ford automobiles, trucks, chassis, Fordson tractors, parts and accessories, remaining on hand and wherever found, without any legal liability whatever, upon tendering to dealer the said purchase price thereof plus freight.

" (19)   Upon termination of this agreement by cancellation or otherwise the dealer shall turn over to the manufacturer all bona fide retail orders that he may have on hand unfilled, and also list of any prospective purchasers within his knowledge, and the manufacturer shall not be liable in any manner whatsoever on account of the cancellation or termination of this agreement, even though thereafter the manufacturer or any new representative should complete any deals inaugurated by dealer.

" (20)   Dealer agrees that he will make repairs on Ford automobiles, trucks, chassis and Fordson tractors, whether sold through him or not, and to perform this work promptly and in workmanlike manner, and that he will not remove or alter the manufacturer's patent plate, motor number, or other numbers or marks affixed to any Ford automobile, truck, chassis, Fordson tractor, part or accessory or permit it to be done.

BURKHALTER *v.* FORD MOTOR CO.  [29 Ga.

" (21)   Manufacturer owns and the Ford automobiles, trucks, chassis and Fordson tractors are manufactured under and embody the following letters patent of the United States of America, namely  .  .  .   together with the rights acquired and established thereto by and through fair trade and trade use.  The validity of each of said patents and of the said trademark registration and trade user rights and of the claims of the manufacturer under said application is hereby expressly admitted, and it is agreed that the sale and use of said Ford automobiles, trucks, chassis, Fordson tractors, parts or accessories, as delivered to the dealer, are restricted according to the terms of this agreement, and that no license is given to handle or use said Ford automobiles, trucks, chassis, Fordson tractors, parts or accessories under such patents and applications, except strictly in accordance with the terms and condition of this agreement.

" (23)   It is agreed that the dealer is in no way the legal representative or agent of manufacturer for any purpose whatsoever except as expressly stated in this agreement, and has no right or authority to assume or create any obligation of any kind, expressed or implied, on behalf of manufacturer, or to bind it in any respect whatever.  He shall make no warranty or representation of manufacturer's products, but shall refer purchaser to retail buyer's order and the printed literature of manufacturer for any warranty made by manufacturer.

" (24)   Dealer shall have no right to asign this agreement or any interest in it without the written consent of the manufacturer.

" (25)   It is mutually understood this is a Michigan agreement and shall.be construed as such.  And it is further understood by the parties hereto that this is a general selling agreement intended for use by manufacturer wherever its products may be sold, and therefore, if any of its provisions shall contravene or be invalid under the laws of the particular State, country or jurisdiction where used, then it is agreed that such contravention or invalidity shall not invalidate the whole agreement, but it shall be construed as if not containing the particular provision or provisions held to be invalid in the said particular State, country or jurisdiction, and the rights and obligations of the parties shall be construed and enforced accordingly.

" In witness whereof the parties have hereunto set their hands and seals the day and year first above written.

" Signature of the dealer.        " Signature of the manufacturer.
" Beasley Motor Company (L. S.)   " Ford Motor Company
      by H. C. Beasley.            .            by Slocum Ball,
                                   Branch Manager." (L. S.)

In our opinion this contract does not in any sense constitute
Beasley an agent for the Ford Motor Company. His ·testimony
does not enlarge the terms of the contract, because it is shown that
he operates solely under the contract, and is limited altogether by
it. Among other things, it is especially contended by the plaintiff
in error that the commission feature of the contract, the duty of
the dealer to advertise the manufacturer's products, the restriction
of territory, the control of prices by the manufacturer, together
with its right of inspection, should establish the contract as one of
agency. It is pointed out, also, that the contract requires that the
dealer shall " give his immediate and careful attention to all in-
quiries and give good representation to all interests of the manu-
facturer." After a careful examination of numerous authorities
upon the question, it is impossible for us to concur in this view.
" The relation of principal and agent arises wherever one person,
expressly or by implication, authorizes another *to act for* him
[italics ours], or subsequently ratifies the acts of another in his
behalf." Civil Code (1910), § 3569. This contract does not au-
thorize Beasley to act for the Ford Motor Company in any matter,
in any degree whatever. It expressly stipulates in its paragraph
23 that " It is agreed that the dealer is in no way the legal repre-
sentative or agent of manufacturer for any purpose whatsoever
except as expressly stated in this agreement,· and has no right or
authority to assume or create any obligation of any kind, expressed
or ·implied, on behalf of manufacturer, or to bind it ·in any re-
spect whatever. He shall make no warranty or representation of
manufacturer's products, but shall refer purchaser· to retail buyer's
order and the printed literature of manufacturer for any warranty
made by manufacturer." This paragraph absolutely denies the au-
thority of Beasley to do anything as the agent of " manufacturer."

Agency may also be defined as the relation created by express or
implied contract or by law, whereby one party delegates the trans-
action of some lawful business with more or less *discretionary*
power to another, who undertakes to manage the affair and render
to him an account thereof. 1 Am. & Eng. Ency. Law, 937.

Even if one be under an engagement to perform a service for another, if he has no discretion whatsoever, his employment does not attain to the dignity of an agency. The contract under consideration does not vest any discretion in Beasley to do anything for the Ford Motor Company, even if it could be said to require any service to be performed. The stipulation of paragraph 23 that he is no agent " except as expressly stated in this agreement " does not affect the question, for the reason that he is nowhere else in the contract " expressly stated " to be an agent or expressly required to transact any business for the company. ·The clause of the contract which requires him to give good representation to the manufacturer's interests does not authorize the doing of any business for it. Unless he can in some way bind the manufacturer in some business transaction, then he is not its agent. This provision, in view of the other stipulations of the agreement, could mean nothing more than a requirement that the dealer should diligently press the Ford products upon the market and create a favorable attitude toward them from the buying public, and gave no authority to Beasley to do any act as an agent for the company. Under the provisions of the document it cannot be logically inferred that he could make a contract or form legal relations with another in behalf of the Ford Motor Company, of the most minor importance, with which the company might be required to comply.

Plaintiff in error cites and relies most earnestly upon the case of Willcox & Gibbs Sewing Machine Co. *v.* Ewing, 141 U. S. 627 (12 Sup. Ct. 94, 35 L. ed. 882), in which a contract with a number of stipulations similar to those above set out was held to create an agency. The agreement in that case, however, did not contain the stipulation absolutely excluding every possible idea of agency. Furthermore, in that case Ewing, who was held to be an agent, was referred to in language implying such a relation. While of course this was not controlling, it was considered. One clause prohibited him from soliciting " trade in the territory of other agents;" another was that he would " bind all sub-vendors or agents " to sustain the established retail prices of the company; and that he was not to " sell his appointment or agency." .

However, in the later case of Banker Brothers Co. *v.* Pennsylvania, 222 U. S. 210 (32 Sup. Ct. 38, 56 L. ed. 168), a contract quite similar to the one now before us was held by the same high

court not to constitute an agency. Mr. Justice Lamar delivered the opinion, as follows:

" The Banker Brothers Company, a corporation doing business in Pittsburg, was charged, as retail vendors, with a tax of 1 per cent. on $351,000 on sales of automobiles to persons in Pennsylvania, under a statute of that State. It denied liability on the ground that the sales were interstate transactions. A decision of that point involves the question as to whether Banker Brothers Company acted as principal or as agent of a New York manufacturer. It appears that the George N. Pierce Company was engaged in the business of manufacturing automobiles in Buffalo, and in 1905 made a contract by which it agreed ' to build for and sell automobiles to Banker Brothers Company at 20 per cent. less than list prices. Deliveries to be f. o. b. Buffalo as soon as practicable after order for deliveries are received. Payments to be made in cash.' The Banker Brothers Company kept no machines in stock except those used for demonstration, and were allowed to sell only within a restricted territory on terms stipulated by the manufacturer. The purchaser of the machine was to pay at least 10 per cent. when he signed a printed form addressed to Banker Brothers Company, requesting it ' to enter my order for —— motor car, for which I agree to pay the list price f. o. b. factory, as follows: $ —— upon signing this order, and the balance upon delivery of the car to me.' The name of the Pierce Company did not appear anywhere on this printed form furnished by it, but when the Banker Brothers Company accepted the order, it remitted the cash to the Pierce Company. If the latter accepted the order, it agreed thereupon to make the automobile and ship it, drawing on Banker Brothers Company for the balance of the list price, less 20 per cent., with bill of lading attached. The Banker Brothers Company, on paying the draft, took up the bill of lading, and received from the carrier an automobile which, though shipped in interstate commerce, had become at rest in the State of Pennsylvania. Banker Brothers Company had the title, and delivered it to the buyer on his paying the balance of the purchase-money. Compare. Dozier v. Alabama, 218 U. S. 124 (54 Law ed. 965, 28 L. R. A. (N. S.) 264, 30 Sup. Ct. Rep. 649). The written contract was silent on the subject, but it was stipulated that the Pierce Company warranted the machine direct to the purchaser.

" It is contended that Banker Brothers Company were agents and the Pierce Company an undisclosed principal. It is urged that the sale was an interstate transaction between the manufacture and the purchaser, with Banker Brothers Company merely acting as an agent which looked after the delivery of the machine and collected the purchase price. This is one of the common cases in which parties find it to their interest to occupy the position of vendor and vendee for some purposes under a contract containing terms which for the purpose of restricting sales and securing payment come near to creating the relation of principal and agent. But, as between Banker Brothers Company and the Pittsburg purchaser, there can be no doubt that it occupied the position of vendor. As such it was bound by its contract to him, and under the duty of paying to the State a tax on the sale.

" The name of the Pierce Company was not mentioned in the order signed by the purchaser. Had there been a breach of its terms he would have had a cause of action against the Banker Brothers Company, with whom alone he dealt. If he had failed to complete the purchase, the Pierce Company would have no right to sue him on the contract. The fact that he was liable for the freight by virtue of the agreement to ' pay the list price f. o. b. factory ' did not convert it into a sale by the manufacturer at the factory; neither was that result accomplished because, with the machine, Banker Brothers Company also delivered to the buyer in Pittsburg a warranty from the manufacturer direct."

For other decisions holding that this character of contract does not create an agency, see the following: Bendix *v.* Staver Carriage Co., 174 Ill. App. 589; Baldwin *v.* Feder, 135 App. Div. 97 (119 N. Y. Supp. 1044) ; Dr. Koch Vegetable Tea Co. v. Malone (Texas), 163 S. W. 662; Standard *v.* Magrane, 254 Fed. 493; Standard *v.* Magrane, 259 Fed. 793, distinguishing Willcox & Gibbs Co. *v.* Ewing, supra.

The relation established by the contract was that of vendor and purchaser, and not that of principal and agent. It is suggested by the plaintiff in error that if Beasley was not an agent of the Ford Company in fact, he was an apparent agent, and that the company would therefore be bound for his acts as such. Even if service upon him as only an apparent agent would be sufficient, we do not find anything in the evidence indicating that he has

been held out as its agent by the company, but if we did, this principle could hardly apply to a case involving the question of the sufficiency of the service of process. In a matter of this kind we must have in mind always " due process," and service of process on merely an apparent agent is not sufficient. It must be made on an actual agent. Civil Code (1910), § 2258; *Vicksburg &c. Ry Co.* v. *DeBow,* supra.

Now we do not mean to hold that it is not possible for the relation of principal and agent to exist in truth despite some contract between the parties to the contrary. In other words, if there is a course of dealing which establishes the relation in fact and in realty, the effect thereof could not be avoided by a secret contract providing otherwise. The true relation would be acted upon by the courts regardless of stipulations that no such relation existed. But in the instant case there is no evidence to show that the contract did not in fact correctly· fix and measure the true relations. There is no evidence of relations between them, or of dealings of a different character and effect from those contemplated by the written agreement, either as between Beasley and the company, or as between third persons and the company through Beasley.

It is contended, again, that the contract is of such a character as to be inhibited by the Federal anti-trust laws. If this be true as a matter of law, we are still unable to see how that would convert the relation of vendor and purchaser, as appears by the face of the agreement, to the relation of principal and agent.

We notice that in *White Co.* v. *American Motor-Car Co.,* 11 *Ga. App.* 285 (75 S. E. 345), this court dealt with a similar contract, and treated the parties throughout as principal and agent, but this was in litigation between the two contracting parties, and the point was not made by either as to whether the contract between them created an agency or not.

Our conclusion is that the evidence demanded the finding as rendered, in favor of the traverse, and that the court was right, therefore, in overruling the motion for a new trial.

The judgment on the main bill of exceptions being affirmed, it follows that the cross-bill must be dismissed.

*Judgment affirmed on main bill of exceptions; cross-bill dismissed. Jenkins, P. J., and Stephens, J., concur.*