Nathan **GELLMAN**, Burt **Horwitz** and Peter **Podany**, co-partners, d/b/a Gellman Brothers, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Civ. A. No. 4324.

United States District Court, D. Minnesota, Fourth Division.

Jan. 26, 1955.

Maurice Weinstein, Milwaukee, Wis., and Charles Halpern, Minneapolis, Minn., for plaintiffs.

H. Brian Holland, Asst. Atty. Gen., Andres D. Sharpe and David W. Richter, Sp. Assts. to the Atty. Gen., and George E. MacKinnon, U. S. Atty., and Alex Dim, Asst. U. S. Atty., St. Paul, Minn., for the United States.

JOYCE, District Judge.

This is a suit for recovery of amounts alleged to have been wrongfully collected from plaintiffs as federal retail excise taxes with respect to certain luggage and jewelry sold by plaintiffs and a predecessor corporation during the period January 1, 1947 through February 1951.

The plaintiffs are co-partners under the name Gellman Brothers. The firm and its predecessors of the same name have been engaged since 1919 in the business of selling a variety of premium and novelty merchandise. For many years it has issued catalogs descriptive of its line of goods and in consequence the bulk of its sales are made in response to mail orders although it also sells through direct solicitation of customers as well as to those who call at its place of business in Minneapolis. The firm has a large volume of trade and the sales here in question constituted a small fraction of its total business.

The Collector of Internal Revenue following an examination of plaintiff's books and records determined that certain leather goods and items of jewelry were sold by Gellman Brothers to its customers "at retail", that such sales were subject to tax under Sections 1651 (a) and 2400 of the Internal Revenue Code, 26 U.S.C.A. §§ 1651(a) and 2400, and assessed a tax with respect thereto in the amount of $9,770.83. The tax plus interest thereon or a total of $10,-952.13 was paid by plaintiffs under protest on January 23, 1952.

Plaintiffs filed timely claims for refund and, the Government having taken no action on the claims within six months of such filing, commenced this suit for refund.

The Government concedes that the original assessment was erroneous in that the tax should properly have been assessed in the amount of $8,374.18 instead of $9,770.83. As a consequence of this concession there remains in dispute here that lesser amount and the interest paid thereon.

The taxpayers concede that the revised amount was properly computed with respect to articles sold by them and that the articles sold were within the purview of one or the other of the sections mentioned, but contend that the articles were not "sold at retail" and accordingly that the tax did not attach.

The Government urges that the articles were "sold at retail" when the last sale occurred prior to use by an ultimate consumer, or in other words that the articles were sold at retail upon that sale which was not for resale. On the other hand plaintiffs contend that their sales were made at "wholesale" for the reason among others that the purchasers had a profit or business motive in buying the articles. It is apparent that un-

der either theory the subsequent disposition of the goods by those who purchased from Gellman Brothers is a relevant factor for consideration here.

In this connection the parties have stipulated that the sales in question were made to five general categories of purchasers and with a few exceptions have reached agreement as to the subsequent use or disposition made of the goods. The substance of the stipulation with reference to the sales made for the period January 1, 1950 through February 1951 may be summarized as follows:

| Category of Customer | Sales | Tax |
|---|---|---|
| (1)—Lodges, Churches & Clubs 100% disposed of by these customers as prizes | $ 3,449.11 | $ 477.29 |
| (2)—Bars, Taverns & Cafes 50% disposed of as prizes | 1,736.08 | 259.19 |
| 50% disposition not agreed but plaintiffs contend was resold | 1,736.17 | 259.19 |
| (3)—Industrial Concerns 100% disposed of in following manner without specific allocation | | |
| (a) given as premiums in connection with sale of other merchandise | | |
| (b) given as incentive awards to employees | | |
| (c) given as awards to employees or preferred customers | 457.60 | 50.55 |
| (4)—Operators, Concessionaires and Pocket Merchants (Peddlers) | | |
| 30% sold to operators and disposed of as prizes on games | 6,101.82 | 970.12 |
| 50% sold to concessionaires and disposed of as prizes | 10,169.69 | 1,616.88 |
| 10% sold to operators—disposition not agreed but plaintiffs contend was resold | 2,033.94 | 323.37 |
| 10% sold to pocket merchants—disposition not agreed but plaintiffs contend was resold by them | 2,033.94 | 323.37 |
| (5)—Individuals 100% disposed of by personal or family use | 5,196.17 | 670.95 |
| Total for period January 1, 1950 through February 1951 | $32,914.42 | $4,950.91 |

The parties have further stipulated that sales for the years 1947 through 1949, upon which the tax was estimated in the amount of $3,423.27, were made to customers in the various categories in the same proportions as shown in the summary and disposed of by them in the manner there indicated.

Viewed in the light of the subsequent disposition made by these purchasers it is apparent that the sales in question fall into three general groups: (1) sales to customers who dispose of the merchandise as gifts to employees or preferred customers, as premiums in connection with the sale of other goods, or

as prizes in the operation of games of chance, or to stimulate attendance at picnics, bazaars or other events conducted by these customers, (2) sales to those individuals who buy for their own or family use, (3) sales to customers who taxpayers claim resell the merchandise to others.

All of these articles were sold by Gellman Brothers but were they sold at "retail" within the meaning of that term as employed in the statutes?

■ It is axiomatic of course that the primary task of interpretation is the discovery of legislative intent or purpose and the effectuation of that intent if such is possible without doing violence to the meaning of the words employed. As stated in Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 93, 55 S.Ct. 50, 54, 79 L.Ed. 211:

"The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will."

Congress in enacting these provisions selected certain categories of articles which may be described as luxury goods. Having selected these subjects it must be assumed unless a contrary intention is evidenced that it intended the tax to bear upon all of the named articles without exception. Having made such selection it was also necessary to indicate the event in the history of each article, between the time it appeared upon the scene through manufacture or importation and the time it disappeared through consumption or use, upon which the tax was to attach. At the time Section 2400 was enacted there was in existence a tax on toilet preparations in the nature of a manufacturer's excise and similar taxes upon jewelry had previously been in effect.

The nature of the manufacturer's excise is indicated in Indian Motorcycle Co. v. United States, 283 U.S. 570, 574, 51 S.Ct. 601, 602, 75 L.Ed. 1277, where the court stated:

"We think it is laid on the sale, * * * and is measured according to the price obtained by the sale. It is not laid on all sales, but only on first or initial sales—those by the manufacturer, producer or importer. Subsequent sales, as where purchasers at first sales resell, are not taxed."

The reasons for shifting the incidence of the present tax to a transaction occurring later in the distributive process are evidenced by the report of the House Committee on Ways and Means, H. R. Rep. No. 1040, 77th Cong., 1st Sess. 33 (1941), where with reference to manufacturer's excises it is stated:

"Experience has proven, however, that under such taxes evasion is substantial and inequitable competitive situations are created. In view of these considerations, the House committee on Ways and Means is convinced of the desirability of placing these taxes upon the retail sale".

Certainly this expression does not indicate an intent to allow any of the named articles to escape untaxed.

The process of defining the appropriate event upon which the present tax was to attach is apparent. As in the case of the manufacturer's excise the event selected was a sale of the article, a readily identifiable transaction which provides a convenient and workable basis for the computation of the tax. But in the course of distribution the article may be sold many times and it must be assumed that only one of these sales was intended to be taxed. What then did Congress mean when it described that sale as "at retail"? It was the obvious intention of Congress to direct the incidence of the tax toward the ultimate consumer and apparently to maximize the tax return by application of

the prescribed rates to the sale at highest price which is almost uniformly the last sale occurring in the process of distribution, and it was this last sale which Congress described as the retail sale. This of course is essentially the antithesis of the first or initial sale under the manufacturer's excise. Since it was not intended to tax the intermediate sales, from wholesaler to wholesaler or from wholesaler to retailer all of which sales are for resale, it is apparent that the term "retail" was employed to differentiate the last sale from the preceding sales for resale, or "wholesale" sales.

It is this concept of "retail" which has been adopted and applied by the agency charged with the enforcement of the law. While no interpretation has been issued specifically defining the term, Treasury Regulations 51, Sec. 320.23, 26 Code Fed.Register, Sec. 320.23 (1949), which will be referred to later in another connection, is necessarily grounded upon such a reading of the statutes.

Is this a permissible interpretation or does the term "retail" as employed in common usage have some settled and certain meaning of more restricted scope? The dictionary suggests in part that the term "retail" is "opposed to wholesale". Webster's New International Dictionary, Unabridged (2d Ed.1938).

If the terms are to be treated as correlatives it is apparent that the breadth of meaning ascribed to the term "retail" will vary inversely with that accorded the term "wholesale". In this connection some authorities at least would restrict the meaning of "wholesale sale", as the court has in effect done here, to sales for the purpose of resale. See Haynie v. Hogue Lumber & Supply Co., D.C.S.D. Miss., 96 F.Supp. 214, 216:

> "The essential distinction between a wholesaler and a retailer is that the person buying from a retailer is the ultimate user or consumer of the article or commodity and does not sell it again, whereas the one buying from a wholesaler buys only for the purpose of selling the article again."

See also Luzier's, Inc., v. Nee, 8 Cir., 106 F.2d 130; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46.

Within the meaning of the above cases the element which distinguishes the retail sale from the sale at wholesale is the absence of the purpose to resell.

The Supreme Court in Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S. Ct. 413, 90 L.Ed. 383, relied upon other and broader definitions of the term "wholesale" for the purpose of demonstrating the narrow meaning to be accorded the term "retail or service establishment" as contained in an exception to the Fair Labor Standards Act, § 13(a) (2), 29 U.S.C.A. § 213(a) (2), and in that case found that the feature which distinguished wholesale from retail sales was the presence of a profit motive in the purchase. Since that case deals with the construction of a different statute it is of course not controlling here. The court was dealing there with an exception to a statute and resorted to an analysis of the language used in that exception only for the purpose of confirming its initial conclusion that the statute was intended to have a broad application and the exception should accordingly be narrowly construed. It is not apparent that the court was indicating any conclusion as to the permissible limits of meaning that might properly be ascribed to the term "retail".

This court does not imply that the broad meaning of the term retail suggested here is the only or indeed the preferable meaning to be ascribed to the term generally but that the term apparently enjoys no fixed or common meaning to the contrary. Accordingly since interpretation of the phrase "sold at retail" as equivalent to "sale for a purpose other than resale" will accomplish the evident purpose of the statute, it will be adopted here.

As thus construed it appears that all the sales in the first and second groups mentioned were properly taxed, for it is not shown that any of the articles purchased were resold. This is

evident as to the second group and demonstrable as to the first.

The concept of sale is defined in Treasury Regulations 51, Sec. 320.1(f), 26 Code Fed.Reg. Sec. 320.1(f) (1949).

"(f) The term 'sale' means an agreement whereby the seller transfers the property (that is, the title or the substantial incidents of ownership) in goods to the buyer for a consideration called the price, which may consist of money, services or other things."

In those cases where the articles were put up as prizes on games of chance the player did not pay a price *for* the goods but merely paid for an opportunity to participate in the play with no assurance of winning anything and generally with no assurance at the time of play which of the number of articles posted as prizes he might win if successful in the play. The operator did not sell to the winning player but merely posted the prize, nor did the winning player purchase the prize but won it as a consequence of the operation of chance. Accordingly dispositions of this character did not amount to sales.

Of course by definition there was no resale with reference to those articles which were "given" to customers or employees but the evidence suggests a possible difficulty as to those articles disposed of as premiums in connection with the sale of other goods. In such case if the price is paid for the associated goods with the knowledge or understanding that a premium will be forthcoming it may be that the premium when delivered has also been sold. The evidence indicates that there has been some attempt made to allow for this possibility in the recomputed tax. In any event the problem need not be pursued here for the plaintiffs have not shown that such a situation existed with reference to any of the items here in question nor has there been any attempt in this case to separate premium uses from the other dispositions made by industrial concerns.

There is of course a disputed issue of fact as to the third group consisting of those sales to bars, taverns, cafes, operators (of punch boards and machines) and pocket merchants which plaintiffs contend were for resale.

■ The plaintiffs of course have the burden of proving as in the case of any suit for refund that the tax collected on such sales was erroneously or illegally collected, United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; Woodward v. United States, D.C.N.D. Iowa, 106 F.Supp. 14, 31, and accordingly that such sales were in fact for resale. In addition, since at least a substantial part of Gellman's sales were at retail, the taxpayers are faced with the presumption created by Treasury Regulations 51, Sec. 320.23, 26 Code Fed. Reg. Sec. 320.23 (1949), which provides in part:

"*Sales for resale.* All sales of taxable articles by persons engaged in the business of selling such articles at retail are presumed to be sales at retail, unless the character of a sale as a sale for resale is evidenced either (1) by a 'retailer's exemption certificate" furnished by the purchaser in the form outlined in this section, or (2) by equivalent proof of exemption.'

The equivalent proof referred to is limited by the following paragraphs of the regulation to a writing setting forth certain designated information. The plaintiffs did not obtain formal exemption certificates or the other "equivalent proof" with reference to the sales here in question.

However, it is not apparent that the above regulation adds to the burden of proof ordinarily incident to a suit of this kind for there is nothing to indicate that the presumption referred to in the regulation is intended to be or could be conclusive and it may be rebutted here by appropriate proof of resale.

■ But the evidence submitted here with reference to the resales by bars, taverns, cafes and operators while it might be sufficient to show that some such resales took place is entirely insufficient to demonstrate the number of articles resold or their value. The bur-

den of proof in this respect is suggested in Malley v. Walter Baker & Co., 1 Cir., 281 F. 41, 47:

"The plaintiff is not entitled to recover more than the amount that it can show it paid as a tax on such portions of the product in question as were not sold and used as candy within the meaning of the Department's regulation."

Furthermore the testimony indicates that the Government in its recomputation of the tax has made allowances with respect to those articles sold by Gellman to customers in this category in those instances where the taxpayers presented evidence of resale. The court will not assume that such allowances were inadequate to compensate for the tax on such articles as the evidence here might be considered to have demonstrated were resold. Cf. Cohan v. Commissioner of Internal Revenue, 2 Cir., 39 F.2d 540.

██ There remains for consideration the matter of the sales to so-called pocket merchants or peddlers. The plaintiffs' evidence indicates that these merchants always resell the goods purchased and the Government's own witness conceded this to be the fact. Recovery of the tax paid on sales to such merchants should be allowed.

The Government concedes that 26 U. S.C.A. § 2407(b) is not a bar to any recovery the plaintiffs might be otherwise entitled to.

Accordingly, plaintiffs are entitled to judgment for (1) the amount of the admitted error in the assessment, (2) the amount collected as tax on the sales to pocket merchants, (3) the amount of their original payment which represented interest on such amounts, and (4) interest as provided by law upon the total thereof. The plaintiffs' claim in all other respects is denied.

Appropriate proposed findings of fact, conclusions of law and order for judgment as indicated may be prepared and submitted.